IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TATE CLARK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:16-CV-910-RP |
| | § | |
| SOUTHWEST AIRLINES COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment, (Dkt. 19), and the responsive pleadings. Having reviewed the filings, the relevant law, and the factual record, the Court grants the Motion for Summary Judgment.

## I. BACKGROUND

The claims in this case arise out of Defendant Southwest Airlines Company's ("Southwest") termination of Plaintiff Tate Clark's ("Clark") employment. Clark began working for Southwest in 2001 in Houston, Texas as a customer service agent. (Clark's deposition testimony, Dkt. 19-2, at 47). In 2010, Clark transferred to Austin, Texas and continued his work as a customer service agent. (*Id.* at 47–48). In 2011, Clark applied for and was approved for intermittent leave under the Family and Medical Leave Act ("FMLA") for his migraine headaches. (*Id.* at 50–51). Clark's intermittent leave continued until his discharge, and he does not claim that was denied FMLA leave during his tenure with Southwest. (*Id.* at 51–52).

   A.   *FMLA events*

After his FMLA intermittent leave began, Clark alleges that two events occurred. First, his supervisor "gave him a poor evaluation due to his attendance," and those missed days were "almost exclusively days approved for FMLA leave." (Clark's state-court petition, Dkt. 1-1, at 3). Clark also

1

alleged that his union representative "heard that management was trying to establish a pattern of his FMLA use to reprimand him for it." (*Id.*). When he testified in his deposition, Clark remembered the negative review was given by Oscar Hernandez ("Hernandez"), a supervisor, but he did not remember which year it was given. (Clark's deposition testimony, Dkt. 19-2, at 57–58). Hernandez did give him an annual review in 2013[1] and that review did mention absences, although Clark, after looking at the review in his deposition, could not confirm that that was the review he claimed was the problem. (*Id.* at 57–58, 61). After he received the problematic review from Hernandez—which may or may not have been in 2013—Clark testified that he asked Hernandez about the use of FMLA leave in the review and Hernandez said Clark was not being "graded" on FMLA absences, "but that that was a factor" and they "would like to see [Clark] more at work." (*Id.* at 58–59).

Second, Clark found a note in his box that said "Leave" and was with a stack of transfer request forms. (Clark's state-court petition, Dkt. 1-1, at 3). Management allegedly treated the situation "like a joke," and Clark submitted a complaint to human resources but "not much was done about it." (*Id.*). Clark testified that management interviewed employees who had worked when the note was put in his box and then distributed or posted a memo stating that people were not to put things in other people's boxes absent an instruction to do so. (Clark's deposition testimony, Dkt. 19-2, at 68). Unhappy with how it was handled, Clark went to a supervisor who "laughed it off like it was some kind of joke." (*Id.* at 69).

Although not alleged in his state-court petition, Clark testified that his SOPI complaints also played a role in his discharge. (*Id.* at 105). At Southwest, an employee could file an SOPI complaint to skip over local management and lodge a complaint directly with someone at the headquarters in Dallas. (*Id.* at 102). Clark filed them frequently, approximately once a month, (*id.*) explaining that he

---

[1] Other supervisors gave Clark reviews in 2012 and 2014, and those reviews negatively reviewed his attendance, but, again, Clark did not claim those reviews were about his FMLA leave and instead claimed that only the review given by Oscar Hernandez addressed his FMLA leave. (Clark's deposition testimony, Dkt. 19-2, at 54–55, 59–60).

2

"was sort of a stickler for the rules, . . . more avid in reading my union guidebook and knew what the procedures were. I complained about it quite frequently and I don't believe that they liked that because I was one of the people that complained the most." (*Id.* at 105).

B.  *Termination*

Southwest terminated Clark's employment on March 9, 2015. (*Id.* at 163). Southwest claims Clark was discharged for "making threatening comments [while at work] about obtaining a trench coat so that he could bring a shotgun to work." (Defendant's Motion for Summary Judgment, Dkt. 19, at 5). Per his testimony, Clark worked on the night of February 25, 2015, into the early morning hours of February 26. (Clark's deposition testimony, Dkt. 19-2, at 109). He worked alone with his co-worker Kate Rutz ("Rutz"). (*Id.* at 109–10). He visited the Lands' End website and viewed, among other things, a trench coat. (*Id.* at 117–18). Rutz asked him if was going to order the coat, and he responded that he was not. (*Id.* at 119–20).

In her deposition testimony, Rutz recalls a different scenario. According to Rutz, Clark said he was not going to order the coat but that he wished it came in black so he could bring his shotgun in. (Rutz's deposition testimony, Dkt. 19-6, at 27–28). Rutz responded, "dude, don't even joke about something like that [and Clark] just kind of chuckled and didn't say, oh I'm not kidding or anything like that." (*Id.* at 28). The next day, Rutz texted their co-worker Diane Largent ("Largent") about Clark's alleged comment, saying it made her uncomfortable and she wasn't sure if she should inform management. (*Id.* at 29–30). Largent advised her to inform management. (*Id.* at 30). Rutz and Largent testified that they both were concerned about Clark's alleged comment because they had seen Facebook posts of his that were derogatory about women and "a lot of things about guns." (*Id.* at 30–31; Largent's deposition testimony, Dkt. 19-7, at 44).

On February 27, 2015, Rutz emailed Southwest Customer Service Manager Roger Molina ("Molina") and Station Manager Tim McGee ("McGee"), stating:

3

> Hi guys, I wasn't sure if I should share this but the more I thought about it, the more it bothered me. On Wednesday night, When Tate & I were working together, he was looking at the Lands End uniform web site. There was a picture of the trench coat and I asked him if he was going to order it. He said no, but I wish they made it in black. I asked him why and he said so he could bring in his shotgun. I told him not to joke about something like that and he just sat there chuckling. I'm not necessarily afraid, but it wasn't the first time he referred to his guns in that manner.

(Rutz's deposition testimony, Dkt. 19-6, at 26; Rutz's email, Dkt. 19-8). In addition, Largent spoke with either Molina or McGee about the alleged incident and asked airport security about reporting "a possible threat to the workforce." (Largent's deposition testimony, Dkt. 19-7, at 38–42).

On March 1, 2015, Southwest suspended Clark with pay. (Clark's deposition testimony, Dkt. 19-2, at 157–58). Several days later, on March 5, Southwest held a hearing. (*Id.* at 158–59). Present at the hearing were: Clark, a union representative, Molina, McGee, and a note-taker. (*Id.*). Clark denied making the comment about bringing in a shotgun and did not answer questions about whether he owned a shotgun.[2] (Hearing Notes, Dkt. 19-16). Prior to the hearing, Southwest—through its IT department—reviewed what Clark had viewed online on February 25, 2017. (McGee's deposition testimony, Dkt. 19-11, at 30–31). At his deposition, Clark looked at the webpages Southwest had pulled and agreed that they represented his online searches that night for rifle scopes, air rifles, and air pistols. (Clark's deposition testimony, Dkt. 19-2, at 122–24). He also had posted on Facebook that night that he had made a "cold weather . . . impulse buy" of a twenty-five round magazine and a black knit Ruger Firearms beanie cap. (*Id.* at 130–32).

On March 9, Southwest held another meeting with Clark and, at that meeting, terminated his employment. (*Id.* at 163). Southwest maintains that Clark was discharged for violating Southwest's Zero Tolerance Workplace Violence Policy that prohibited threatening workplace violence. (Defendant's Motion for Summary Judgment, Dkt. 19, at 15).

---

[2] In his subsequent deposition, Clark stated that he owned a shotgun, a rifle, and a pistol. (Clark's deposition testimony, Dkt. 19-2, at 123).

4

*C.    Procedural History*

On June 27, 2016, Clark sued Southwest in the 345th Judicial District of Travis County. (Clark's state-court petition, Dkt. 1-1). Southwest removed the case to federal court on July 27 based on the federal question presented. (Defendant's Notice of Removal, Dkt. 1). Southwest filed its Motion for Summary Judgment on July 12, 2017. (Dkt. 19). The motion was fully briefed as of August 25, 2017. (Dkt. 24). After Clark filed his response to the summary judgment motion, Southwest filed a Motion to Strike Plaintiff's Summary Judgment Evidence. (Dkt. 23). That motion was referred to Magistrate Judge Andrew Austin, who denied it. (Dkt. 26).

## II. STANDARD OF REVIEW

*A.    Summary Judgment*

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). "After the non-

movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view this evidence in the light most favorable to the non-movant, *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993), and should "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

B.  *FMLA and Mixed-Motive Framework*

FMLA entitles employees to take reasonable leave for medical reasons. 29 U.S.C. § 2601(b)(2). The act prohibits employers from discharging an employee for opposing any practice made unlawful by the act. *Id.* § 2615(a)(2). The Department of Labor interpreted that provision to forbid employers from firing employees for having exercised FMLA rights. 29 C.F.R. § 825.220(c).

In the absence of direct evidence, the Fifth Circuit applies the mixed-motive framework to FMLA retaliation claims.[3] To survive summary judgment under this burden-shifting framework, an employee must first make a prima facie case of FMLA retaliation. *Richardson v. Monitronics International, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer carries this burden, the burden shifts once more to the employee to offer sufficient

---

[3] Clark presents facts, not as direct evidence, but instead to establish a prima facie case and pretext. *See* Dkt. 22, at 7. Clark also admits that he relies only on his subjective belief that his FMLA leave was the reason for his termination and does not have any "evidence, documents, [or] testimony that supports" his belief. (Clark's deposition testimony, Dkt. 19-2, at 195). The Court also does not find any direct evidence of discriminatory intent. To the extent that Clark's briefing could be construed as arguing that Hernandez's alleged remarks to Clark about Clark's FMLA absences are direct evidence, his comments do not constitute direct evidence. Clark cannot direct the Court to when Hernandez made the alleged comments. *Garcia v. Penske Logistics, LLC*, 165 F. Supp. 3d 542, 557 (S.D. Tex. 2014), *aff'd sub nom. Garcia v. Penske Logistics, L.L.C.*, 631 F. App'x 204 (5th Cir. 2015). Based on the evidence presented, the most recent annual review conducted by Hernandez was in 2013, so even assuming he made his comments then, that is years before Clark's termination and therefore the comments were not proximate in time. *Id.* at 557–58.

evidence to create a genuine issue of fact that the employer's reason is a pretext for discrimination or that discrimination was one of several reasons, including the employer's given reason. *Id.* If an employee meets that burden, an employer may still escape liability by proving that it would have taken the same adverse employment action despite its retaliatory motive. *Id.* "The employer's final burden is effectively that of proving an affirmative defense." *Id.* (internal quotation marks omitted).

Southwest urges this Court to adopt a slightly different standard pursuant to two Supreme Court decisions—*University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013), and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)—that limited the applicability of the mixed-motive framework in cases involving Title VII and the Age Discrimination in Employment Act. (Defendant's Motion for Summary Judgment, Dkt. 19, at 10–11.). In those cases, the Supreme Court held that plaintiffs alleging Title VII retaliation or ADEA discrimination must allege that their protected activity was the "but for" cause of the employer's adverse employment action. *See Nassar*, 133 S.Ct. at 2534; *Gross*, 557 U.S. at 176. In *Ion v. Chevron USA, Inc.*, the Fifth Circuit acknowledged the change in law for those other types of discrimination cases but declined to consider whether the *Nassar* approach applied to FMLA retaliation claims. 731 F.3d 379, 389–90 (5th Cir. 2013).

In their Motion for Summary Judgment, Southwest claims that the Fifth Circuit "recently opined that the heightened 'but for' causation standard for Title VII retaliation claims may also apply to FMLA retaliation claims," (Defendant's Motion for Summary Judgment, Dkt. 19, at 15), citing *Wheat v. Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016). This Court disagrees with Southwest's implication. In *Wheat*, the Fifth Circuit was clear in its conclusion that it would not apply the "but for" causation standard because "[n]either this Court, nor the Supreme Court, has decided whether the heightened 'but for' causation standard required for Title VII retaliation claims applies with equal force to FMLA retaliation claims." *Id.* at 706. This Court therefore rejects

7

Southwest's suggestion, follows Fifth Circuit precedent as it now stands, and proceeds with the mixed-motive analysis for FMLA retaliation claims.

## III. DISCUSSION

The question before this Court is whether Southwest discharged Clark as retaliation for taking FMLA leave.[4] Using the mixed-motive framework, this Court starts with determining whether Clark has established a prima facie case of FMLA retaliation. To do so, the plaintiff employee must show that: "(1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action." *Id.* at 705. Southwest does not dispute the first and second elements and focuses its argument on the third and final element of causation. (Defendant's Motion for Summary Judgment, Dkt. 19, at 12).

*A.     Prima Facie Case of FMLA Retaliation*

The Fifth Circuit has recognized that the burden of establishing this "causal link" element of a prima facie case is not an onerous burden. *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 n.8 (5th Cir. 1998); *Martin v. J.A.M. Distributing Co.*, 674 F. Supp. 2d 822, 843–44 (E.D. Tex. 2009); *Vincent v. Coll. of the Mainland*, No. CV G-14-048, 2016 WL 5791197, at *10 (S.D. Tex. Sept. 30, 2016), *aff'd*, No. 16-41465, 2017 WL 2927630 (5th Cir. July 7, 2017).

In this case, Clark intermittently and continuously used FMLA leave for years before his termination, and he admitted that he was never denied FMLA leave even when he went over his allotted number of days per month. (Clark's deposition testimony, Dkt. 19-2, at 51–54). To the extent Clark now claims that his FMLA leave on February 27, 2015, is connected to his March 9, 2015, termination, Clark shows temporal proximity between his day of FMLA leave and his termination. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse

---
[4] Clark does not allege FMLA interference and admitted in his deposition that Southwest did not deny him FMLA leave. (Clark's deposition testimony, Dkt. 19-2, at 51–54).

employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotation marks omitted).

Southwest argues that the temporal proximity in this case is not sufficient to constitute a causal link because Southwest terminated Clark's employment when he violated the Workplace Violence Policy and his leave on February 27 was merely incidental. Southwest compares the instant set of facts to those of *Jarjoura v. Ericsson, Inc.*, 266 F. Supp. 2d 519 (N.D. Tex. 2003), *aff'd*, 82 F. App'x 998 (5th Cir. Dec. 17, 2003) (per curiam). In *Jarjoura*, the court considered a case where the employee was terminated shortly after he was placed on full FMLA leave but because the employee had violated the employer's policy regarding use of a corporate credit card. *Id.* at 531. The court reasoned that because the record "conclusively reveal[ed] some other nonretaliatory reason for Ericsson's decision to terminate," the temporal proximity was "simply too slender a reed to support an inference that retaliation occurred because [the employee] took FMLA leave." *Id.* This Court agrees the *Jarjoura* court's reasoning. Temporal proximity alone "sometimes" establishes a causal link, *Porter v. Houma Terrebonne Hous. Auth. Bd. of Commr's*, 810 F.3d 940, 948 (5th Cir. 2015), but not always. Clark was not exempted from Southwest's employee policies because he took FMLA leave, and, without more, the closeness between the final day Clark took FMLA leave and his termination may not establish a causal link. *See Jarjoura*, 266 F. Supp. 2d at 531 ("An antidiscrimination or retaliation statute does not exempt an employee from violations of company work rules or job requirements."); *Hoogstra v. W. Asset Mgmt., Inc.*, 560 F. Supp. 2d 515, 523–24 (E.D. Tex. 2006) (quoting *Jarjoura* for the proposition that "timing alone is not enough to support retaliation when evidence shows that the employer's actions were justified").

While the Court believes the instant case is one where mere temporal proximity could arguably be insufficient to show a causal link, the Court finds that the close proximity between Clark's discharge and his protected activity minimally establishes the causation element of Clark's

9

prima facie case of FMLA retaliation. Accordingly, the Court turns to the next step of the analysis—whether Southwest has met its burden of showing a non-discriminatory reason for Clark's discharge.

  B.  *Southwest's Non-Retaliatory Reasons for Terminating Clark's Employment*

Because Clark satisfies the first requirement, Southwest "must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Richardson*, 434 F.3d at 333. Southwest maintains Clark was discharged because he violated its Zero Tolerance Workplace Violence Policy that prohibited making threats of workplace violence. (Defendant's Motion for Summary Judgment, Dkt. 19, at 15). Clark's coworker Kate Rutz testified that Clark told her he wished a trench coat, for sale online, came in black so that he could bring in his shotgun. (Rutz's deposition testimony, Dkt. 19-6, at 27–28). She sent an email to her managers expressing her concern about Clark's comments, (Rutz's deposition testimony, Dkt. 19-6, at 26; Rutz's email, Dkt. 19-8), and then Southwest suspended Clark and began their investigation which included an IT review of his online activity on the night in question and also two meetings with Clark and a hearing, (Clark's deposition testimony, Dkt. 19-2, at 122–24, 157–59). After completing the investigation, Southwest terminated Clark's employment.

In his deposition, Clark testified that he had been aware of Southwest's workplace violence policy and had received training on it. (*Id.* at 168.). He also said he had understood that it was a "zero tolerance" policy, conceding that there was "no room" "to have any sort of excuse for that." (*Id.* at 169). He further admitted that he had been aware that making a threat violated the policy. (*Id.*). Clark also agreed that, if he had made it, his comment about bringing in a shotgun would have violated the policy and would have been grounds for termination. (*Id.* at 121).

Since Southwest has produced a legitimate, non-discriminatory reason for discharging Clark, the burden shifts back to Clark to offer sufficient evidence to create a genuine issue of fact that Southwest's non-discriminatory reason was pretext for discrimination.

C.  *Clark Fails to Establish Pretext*

Clark's denial that he made the comment about bringing in a shotgun does not create a genuine issue of fact that would defeat Southwest's Motion for Summary Judgment. The Court need not determine whether Clark actually said that or whether Southwest made a correct decision in firing Clark but whether Southwest was motivated by retaliation. In determining whether an employer engaged in discrimination in using allegations of misconduct lodged by another employee, "[t]he real issue is whether the employer reasonably believed the employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually believe the co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal." *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993).

Reviewing Clark's briefing and the evidence charitably, Clark presents three events to show pretext: (1) his poor performance evaluation that was based on his use of FMLA leave; (2) the "Leave" note left in his employee box; and (3) his frequent SOPI complaints.[5] *See supra* Section I.A.

First, Clark relies on a performance evaluation given by Oscar Hernandez that negatively reviewed Clark's performance based on absences that, according to Clark, were, at least in part, FMLA absences. During his deposition, Clark was presented with evaluations from different years, including a 2013 review by Hernandez, but Clark could not confirm whether the 2013 review by him was the problematic review. (Clark's deposition testimony, Dkt. 19-2, at 57–58). Clark's 2012 and 2014 reviews were not given by Hernandez, (*id.* at 54, 59–60), and the Court excludes those reviews from its analysis since Clark asserts that only the (unidentified) Hernandez review shows discriminatory motivation, (*id.* at 55–56, 60). After Clark received the 2013 Hernandez review, he told Hernandez that he "shouldn't be docked for [the listed dates that he was on FMLA leave]." (*Id.* at 58). According to Clark, Hernandez responded that Clark was not being "graded" on FMLA

---

[5] Clark did not raise his SOPI complaint allegations in his state-court petition, but this Court considers them without deciding whether they are properly before the Court for the purposes of deciding the Motion for Summary Judgment.

absences, "but that that was a factor" and they "would like to see [Clark] more at work." (*Id.* at 58–59). Even assuming the 2013 review and Hernandez's comments about it show discriminatory intent, the 2013 review was an "end-of-year performance review" that Clark signed in November 2013, (*id.* at 56), long before Southwest terminated Clark's employment in 2015, and presumably Hernandez's comments were made around the same time. Similarly, the "Leave" note, that was with a stack of transfer forms, was left in his box in July 2013, even longer before the termination took place. (*Id.* at 64). After both of those events, Clark continued to use his FMLA leave for long periods of time and does not claim he was denied FMLA leave one time.

Assuming without deciding that the Hernandez review and subsequent comments and the "Leave" note show discriminatory motivation, both of the events lack temporal proximity to the adverse employment action. Although Clark does not specify when he received the Hernandez review or when Hernandez made his comments, the Court assumes the complained-of review is the 2013 review, which would be the most recent Hernandez review. That review and the "Leave" note occurred more than one year before the termination. The "Leave" note was left in Clark's box at least 1.5 years prior to the termination, and the 2013 review was given at least fifteen months prior. The spans of time between the allegedly discriminatory acts and the adverse employment action are too great to constitute sufficient evidence of retaliation. *See Garcia v. Penske Logistics, L.L.C.*, 631 F. App'x 204, 211–12 (5th Cir. 2015) (determining that comments made two years before an adverse decision were not proximate in time and therefore were not sufficient evidence of retaliation).

The SOPI complaints appear to have been continuous throughout Clark's employment, but Clark does not show that they related to his FMLA leave. In his deposition, Clark stated that he did not remember filing a SOPI related to his FMLA leave. (Clark's deposition testimony, Dkt. 19-2, at 103). While he does not exclude the possibility that the SOPI complaints dealt with his FMLA leave, he makes clear that his complaints were about union rules: "I was sort of a stickler for the

12

rules . . . I was more avid in reading my union guidebook and knew what the procedures were." (*Id.* at 105). When asked if his SOPI complaints were about union issues, Clark responded: "Things of that nature, yeah." (*Id.*) Having produced no SOPI complaint that related to his FMLA leave, Clark cannot rely on them to show a causal link between his SOPI complaints and Southwest's alleged FMLA retaliation.

Clark additionally raises a "cat's paw theory:" that Kate Rutz and Diane Largent believed Clark abused his FMLA leave and influenced the decision makers to terminate Clark's employment and therefore their discriminatory attitudes may be imputed to the formal decision maker. (Plaintiff's Response to Motion for Summary Judgment, Dkt. 22, at 3–4, 7–8, 11). Clark's cat's paw theory is equally unavailing. As to Rutz, in one vein, Clark argues that she had a problem with Clark using FMLA leave, (*id.* at 11), and then in another vein, Clark complains that, when the termination decision was made, management "did not ever talk to Kate Rutz about what she alleged Tate Clark had said." (*Id.* at 10). Clark's main complaint with respect to Rutz seems to be a lack of communication with management. To the extent Clark contends Rutz complained about Clark, he lacks supporting evidence. In his deposition, Tim McGee, the person who purportedly made the termination decision, testified that some employees were frustrated when a coworker took FMLA leave. (Tim McGee's deposition testimony, Dkt. 22-4, at 76). When asked if Rutz was of the employees who complained, McGee said she may have been, but he did not remember her "explicitly telling me anything like that." (*Id.* at 76–77).

With respect to Largent, McGee testified that Largent complained about Clark "calling in sick" and that "it wasn't fair." (*Id.* at 20). Largent testified that she was inconvenienced, but not upset, by Clark's absences—because she and other coworkers would be called in to work his shifts—and that she was not in a position to judge the validity of his medical reason to miss work. (Diane Largent's deposition testimony, Dkt. 22-6, at 24–25, 68). Clark fails to demonstrate, however,

13

that Largent's complaints to McGee about Clark's absences impacted the termination decision. In fact, in his deposition, McGee stated that not only that it was not a problem for employees to use FMLA leave but that it was their "right." (Tim McGee's deposition testimony, Dkt. 22-4, at 20).

To succeed with his cat's paw theory, Clark must submit evidence sufficient to establish that: (1) a coworker exhibited discriminatory animus, and (2) the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (internal quotation marks omitted); *Jones v. Children's Hosp.*, 58 F. Supp. 3d 656, 665 n.68 (E.D. La. 2014) (applying the cat's paw analysis in FMLA retaliation case). In her email to McGee and Roger Molina on March 6, 2015—after Clark allegedly made his shotgun comment and before he was terminated—Largent stated that she had received a text from Rutz about the comment and then described why she found it "disturbing and uncomfortable." (Diane Largent's email, Dkt. 22-6). She went on to describe Clark's Facebook posts about guns and violence. (*Id.*). Nowhere in that email does she mention Clark's absences or his use of FMLA leave. And McGee testified that Clark's attendance had nothing to do with why he was discharged.[6] (Tim McGee's deposition testimony, Dkt. 22-4, at 72). Clark also does not allege that Largent (or Rutz) possessed "leverage, or exerted influence, over" McGee or Molina.

Moreover, Southwest's undisputed record of approving Clark's FMLA leave for years before his termination counsels against a finding of pretext. In *Garcia v. Penske Logistics, LLC*, the court grappled with that very issue. 165 F. Supp. 3d 542, 561 (S.D. Tex. 2014), *aff'd sub nom. Garcia v. Penske Logistics, L.L.C.*, 631 F. App'x 204 (5th Cir. 2015). The employee had taken FMLA leave twenty-five times from 2005 to 2011, and the employer approved each request. *Id.* The court noted that courts

---

[6] In his Response to the Motion for Summary Judgment, Clark states that "McGee wrote an email which stated that Tate Clark 'wasn't the best with attendance.'" (Dkt. 22, at 11). Clark argues that that phrase shows McGee had a problem with Clark's attendance. Clark provided a one-page excerpt of McGee's testimony to support his assertion. (Tim McGee's deposition testimony, Dkt. 22-4, at 72). From what can be construed from the testimony, McGee wrote the email in response to someone who was asking about Clark's work schedule, and McGee was "trying to elicit to her, I don't know for sure if he'll be here," and he specified that he said that only because of "the context." (*Id.*). He was then asked whether attendance had anything to do with why Clark was terminated. He responded, "no." (*Id.*).

14

have found that "prior approval of numerous FMLA requests counters against attempts to establish pretext through proximity in time." *Id.*

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant Southwest Airlines Company's Motion for Summary Judgment is **GRANTED**.

**SIGNED** on October 26, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE